## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | | |
|---|---|---|
| **SHANNON SCHEMEL,** | ) | |
| **STEPHEN OVERMAN,** | ) | |
| and **MICHAEL TSCHIDA,** | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. _____** |
| | ) | |
| v. | ) | |
| | ) | |
| **CITY OF MARCO ISLAND, FLORIDA,** | ) | **Declaratory** |
| 50 Bald Eagle Drive | ) | **Relief Requested** |
| Marco Island, FL 34145, | ) | |
| | ) | |
| **TRACY FRAZZANO,** in her official capacity as | ) | |
| Chief of Police for the City of Marco Island, | ) | |
| 50 Bald Eagle Drive | ) | |
| Marco Island, FL 34145, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Shannon Schemel, Stephen Overman, and Michael Tschida,

through undersigned counsel, allege as follows:

## NATURE OF THE ACTION

1.  Plaintiffs bring this suit to stop the ongoing violation of their Fourth

Amendment rights by the City of Marco Island, Florida.  The Fourth Amendment

to the U.S. Constitution prohibits the government from engaging in "unreasonable

searches and seizures." The Fourth Amendment has a strong preference for warrants, and government searches are presumptively unlawful unless the police first obtain a judicial warrant supported by probable cause.

2. Despite that constitutional protection of personal privacy, and a similar provision of the Florida Constitution, Defendants have been conducting continuous searches of Schemel, Overman, Tschida, and other Marco Island residents since April 23, 2021. On that date, Defendants deployed at least three automated license plate recognition ("ALPR") systems at strategic locations throughout the City. The ALPRs photograph and record the license-plate information of every vehicle that passes by. Because individuals must pass over one of three bridges to enter and exit Marco Island and because Defendants have mounted the ALPRs on poles located on or near each of those three bridges, Defendants record and store the license plate information of *every* vehicle that enters and exits Marco Island, as well as the time and date of entry and exit.

3. Defendants retain the data collected by ALPRs for three years. Plaintiffs Schemel, Overman, and Tschida and many other local residents pass over at least one of those bridges nearly every day, with the result that Defendants have now recorded and stored a vast quantity of information about the daily life of Plaintiffs and their fellow citizens.

2

4.   When the government takes isolated photographs of events occurring at a particular location, it does not engage in a "search" within the meaning of the U.S. and Florida Constitutions.  But by systematically collecting data about individual citizens for an extended period of time and retaining that information for up to three years, Marco Island is engaged in a search that is subject to constitutional limitations and that is unlawful in the absence of a judicial warrant.

## JURISDICTION AND VENUE

5.   The Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

6.   The Court may award injunctive and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.

7.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

8.   Plaintiff Shannon Schemel is a citizen of Florida who has resided within the City of Marco Island for many years.

9.   Plaintiff Stephen Overman is a citizen of Florida who has resided within the City of Marco Island for many years.

10.   Plaintiff Michael Tschida is a citizen of Florida who has resided within the City of Marco Island for many years.

11.  Schemel's, Overman's, and Tschida's principal means of transportation are their cars.  They regularly drive their cars in connection with their everyday activities; *e.g.*, commuting to work, shopping, visiting friends, and attending meetings of groups with which they are affiliated.  Those car trips cause them to enter and exit Marco Island virtually every day.

12.  Indeed, they could not complete their daily responsibilities without using their respective cars.

13.  Defendant City of Marco Island (the "City") is a municipality located within Collier County, Florida with a population of about 18,000.  It is situated on an island off of Florida's Gulf Coast, the largest of the barrier islands along the southwest coast with land area of just over 12 square miles.

14.  Defendant Tracy Frazzano is the Chief of Police of the City of Marco Island.  In her official capacity, she is in charge of installation and upkeep of ALPRs, and for the collection, retention, and dissemination of Plaintiffs' information collected by the ALPRs.

15.  Three bridges connect the mainland to Marco Island.  It lacks any commercial train or airline service, and thus virtually the only means of entering or exiting the island is to drive a vehicle across one of the three bridges.

4

16.  Defendant City of Marco Island and Defendant Tracy Frazzano are collectively referred to as "the City" in this Complaint.

## FACTUAL BACKGROUND

### Automatic License Plate Recognition Systems

17.  ALPRs are high-speed cameras capable of recording images of the license plates of all motor vehicles that come within their field of vision.  They can be operated while mobile (*e.g.*, placed in a moving police car) or while placed at a fixed location.  A single ALPR is capable of recording thousands of license plate images per minute.

18.  ALPRs are connected to systems that convert the images of license plates into computer-readable data; the system records license-plate number as well as the date, time, and location of the observation.

19.  Proponents of ALPRs argue that ALPRs can serve important law-enforcement functions.  For example, if an ALPR reads the license plate of a vehicle whose registration has expired or whose owner's driver's license has been suspended, police claim that they can use the system to locate the vehicle, stop the driver, and issue a citation.

20.  ALPRs, however, also pose a threat to privacy interests.  By aggregating location information for a single vehicle over extended periods of

5

time, ALPRs can reveal detailed information about the daily activities of the driver of that vehicle.  The threat to privacy interests is reduced considerably if license-plate data are retained for no more than a few days.

21.  ALPRs are generally operated by local police departments.  Even though the overwhelming majority of data generated by ALPRs has absolutely no connection with criminal activity, those departments frequently share all information about innocent motorists gleaned from their ALPRs with other law-enforcement agencies.  The result of that data sharing is to significantly increase the potential threat to privacy interests.

### ALPRs Come to Marco Island

22.  Marco Island began using its first ALPR in 2015—a mobile unit mounted on a squad car.  The ALPR is capable of comparing captured images to Marco Island's database in real time.  Over the past six years, this single unit has captured images of more than 1,000,000 license plates.

23.  At a "capital budget workshop" on June 8, 2020, Police Chief Tracy Frazzano proposed to the Marco Island City Council the purchase of three additional ALPRs.  She proposed that two of the new ALPRs be placed on the S.S. Jolley Bridge (so as to separately capture northbound and southbound traffic) and that the third one be placed on another bridge.  She stated that the number of

images captured *annually* by the three cameras would be far greater than those captured by the mobile unit—probably numbering in the millions.  The City Council voted to approve the budget proposal.

24.  The New Civil Liberties Alliance (NCLA), an organization whose attorneys are representing Plaintiffs in this suit, submitted a letter to City Council members on June 17, 2020, urging the City Council to reconsider approval of the new ALPR purchases. A copy of the June 17 letter is attached hereto as Exhibit A.

25.  NCLA noted Chief Frazzano's "alarming" admission that data collected by the ALPRs would be retained for a minimum of three years.  And even after three years, it would not be expunged if "it has an investigative purpose."  Exhibit A at 4.

26.  NCLA stated that the City Council had received no evidence indicating that this new surveillance system was necessary.  NCLA noted that Marco Island in 2020 was ranked as one of the three safest cities in the State of Florida (out of 129 cities reporting data).  See *Safest Cities in Florida*, Alarms.org, January 19, 2020, *available at* https://www.alarms.org/safest-cities-in-florida/.  *Ibid.*

27.  NCLA argued that installation of new ALPRs that would record every movement of individuals onto and off of the island constituted an unwarranted

invasion of personal privacy, in violation of both the U.S. and Florida

Constitutions.  *Id.* at 4-8.

### Marco Island Installs Three New ALPRs

28.  NCLA received no response to its June 17, 2020 letter.

29.  On April 22, 2021, the Marco Island Police Department announced that

the City would deploy its new ALPRS the next day.  A copy of the press release is

attached as Exhibit B.

30.  The press release indicates that at least three new ALPRs were installed

and suggests that a fourth new ALPR may also have been installed.  An ALPR has

been installed on each of the two spans of the Jolley Bridge.  A third ALPR has

been installed on San Marco Road (at its intersection with Stevens Landing Drive)

on the approach to the Gober Bridge.  By installing ALPRs on or near the three

bridges, the City ensured that *every* vehicle entering and exiting the island is being

photographed, 24 hours a day, seven days a week.

31.  Indeed, the press release makes clear that the City's desire to ensure

100% coverage was its reason for placing ALPRs on or near the bridges.  The

press release stated:

> Marco Island is geographically the optimal location to place stationary
> ALPR devices due to our unique nature.  Unlike a city with countless
> streets entering its jurisdiction, all our vehicular traffic enters and leaves

8

via three bridges (Jolley, Minozzi [an alternate name for one of the Jolley spans], and Go[b]er).  Our bridges, as focal points, allow for a minimum of four cameras.

32.  Ominously, the press release indicates that the City plans to use its ALPR system not only to investigate and uncover criminal activity but also to "deter" misconduct that has not yet taken place.  The press release quotes Police Chief Frazzano as saying, "The system has a strong deterrent value which improves community safety and helps us probatively reduce crime and traffic incidents before they occur."  In other words, those entering Marco Island are warned: we are watching you.

**Plaintiffs Are Photographed**

33.  In the months since Defendants began operating the three stationary ALPRs, Plaintiffs Schemel, Overman, and Tschida have driven across the island's three bridges on hundreds of occasions.

34.  Because the ALPRs are designed to photograph and record the license plate of *every* vehicle that crosses one of the three bridges, on information and belief Plaintiffs and their cars have already been photographed on hundreds of occasions, and the numbers will continue to increase on a daily basis.  Such photographs are in addition to the many occasions they likely have been photographed by the City's mobile ALPR.

9

35.  Defendants are rapidly accumulating a large database that provides a detailed picture of Plaintiffs' movements.  Based on the frequency and times of day of their bridge crossings, Defendants can easily draw a detailed profile of their day-to-day life.  Yet Defendants have no plans to expunge any of that data regarding innocent and lawful conduct in the foreseeable future.  Indeed, Police Chief Frazzano has indicated that her department intends to maintain those records for at least three years.

36.  Members of the Florida legislature have stated that retention of such data creates privacy concerns.  In 2014, the legislature adopted a statute seeking to limit data retention.  Fla. Stat. § 316.0778(2) (requiring state officials to "establish a retention schedule for records containing images and data generated through use of an [ALPR] system.  The retention schedule must establish a maximum period that the records may be retained").

37.  In response, Florida's Criminal and Juvenile Justice Information System Council issued "Guidelines for the Use of Automated License Plate Readers."  *See* https://www.fdle.state.fla.us/cjjis/documents/cjjis-council-alpr-guidelines.  Included within the Guidelines is a provision stating that "information that is gathered without specific suspicion may be retained for no longer than 3 anniversary years."  Guidelines, § 6(e).  The Guidelines specify no *minimum*

period for record retention and make no recommendations regarding how long

data *should be* retained.

## The Fourth Amendment

38.  The Fourth Amendment to the U.S. Constitution protects "[t]he right of

the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures."  The "basic purpose" of the Fourth

Amendment "is to safeguard the privacy and security of individuals against

arbitrary invasions by government officials."  *Camara v. Municipal Court of City

and County of San Francisco*, 387 U.S. 523, 528 (1967).

39.  The government engages in a "search" subject to Fourth Amendment

controls whenever it intrudes upon something an individual seeks to preserve as

private, so long as society is prepared to recognize the privacy interest as

reasonable.

40.  Among the privacy interests to which the Supreme Court has extended

Fourth Amendment protection is the expectation of privacy in one's physical

location and movements.  People do not surrender that privacy right simply

because they are moving along public roads or are otherwise venturing into the

public sphere.  Although those traveling in public must accept that other

individuals (including police officials) may be watching them for some portion of

11

their travels, they may legitimately expect that (in the absence of probable cause) they will not be subject to constant electronic monitoring.

41.  Thus, in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the Supreme Court held that government collection of an individual's cell phone records (records from which the government could deduce the individual's approximate location over time) constituted a "search" for Fourth Amendment purposes.  In *United States v. Jones*, 565 U.S. 400 (2012), five justices concluded that the government conducted a Fourth Amendment "search" when it monitored the movement of an individual's car for 28 days by using a Global-Positioning-System (GPS) tracking device.  565 U.S. at 430 (Alito, J., concurring in the judgment); *id.* at 415 (Sotomayor, J., concurring).

42.  The more information the government collects about an individual's travels, the greater the intrusion upon the individual's expectations of privacy. Government collection of cell phone and GPS data for more than a brief time period constitutes a Fourth Amendment search because it "provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Carpenter*, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).

43.  *Carpenter* declined to specify precisely how much cell phone data the government may collect before its efforts constitute a search subject to the Fourth Amendment.  It held merely that collecting an individual's cell phone data for a seven-day period sufficed to constitute a Fourth Amendment search.  *Id.* at 2217 n.3.

44.  This type of search by law-enforcement officials violates the Fourth Amendment unless they first obtain a judicial warrant supported by probable cause, or unless it falls within a specific exception to the warrant requirement.  *Id.* at 2221.  None of those exceptions applies here.

## The Florida Constitution

45.  Article I, section 12 of the Florida Constitution, entitled "Searches and Seizures," states that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated."

46.  The privacy protections afforded by Article I, section 12 closely parallel those afforded by the Fourth Amendment.  Indeed, it contains a conformity clause, which requires that "[t]his right shall be construed in conformity with the 4th

Amendment to the United States Constitution, as interpreted by the United States Supreme Court."

47.  Even before the U.S. Supreme Court's *Carpenter* decision addressed the Fourth Amendment implications of government collection of cell phone data, the Florida Supreme Court held that collection of such data constituted a government "search," stating that an individual has "a subjective expectation of privacy in the location signals transmitted solely to enable the private and personal use of his cell phone, *even on public roads*, and that he d[oes] not voluntarily convey that information to the service provider for any purpose other than to enable use of his cell phone for its intended purpose." *Tracey v. State*, 152 So. 3d 504, 525 (Fla. 2014) (emphasis added).

48.  Article I, section 23 of the Florida Constitution, entitled "Right of Privacy," states that "[e]very natural person has the right to be let alone and free from government intrusion into the person's private life except as otherwise provided herein."

49.  The Florida Supreme Court has explained that the right to privacy protected by Article I, section 23 is "no less fundamental" than other rights protected by the Florida Constitution, *Weaver v. Myers*, 229 So. 3d 1118, 1130

(Fla. 2017), and is "broader, more fundamental, and more highly guarded than any federal counterpart." *Id.* at 1125.

50.  If an individual possesses a legitimate expectation of privacy in the information at issue, then Article I, section 23 shifts the burden of proof to the government to show that (a) there is a "compelling state interest" warranting an intrusion into the individual's privacy for the purpose of collecting the information; and (b) the compelling interest is satisfied "through use of the least intrusive means." *Winfield v. Division of Pari-Mutuel Wagering*, 477 So. 2d 544, 547 (Fla. 1985).

51.  Florida voters added Article I, section 23 to the Florida Constitution in 1980.  The then-Chief Justice of the Florida Supreme Court explained that the amendment was prompted by "a public concern about how personal information concerning an individual citizen is used," particularly in light of technological changes that facilitate collection and "easy distribution by computer operated information systems." *Rasmussen v. South Fla. Blood Service, Inc.*, 882 So. 2d 1037, 536 (Fla. 1987) (quoting speech by Overton, C.J., to Florida's 1977-78 Constitution Revision Commission).  The "principal aim" of Article I, section 23 is "to afford individuals some protection against the increasing collection,

15

retention, and use of information relating to all facets of an individual's life."
*Ibid.*

## CLAIM I

## Violation of the Fourth Amendment

52.  Plaintiffs Schemel, Overman, and Tschida repeat and incorporate by reference the allegations of Paragraphs 1 through 51 of the Complaint.

53.  By strategically placing ALPRs on or near each of the bridges leading into and out of Marco Island and operating them (as well as the mobile ALPR) continuously since April 23, 2021, the City has succeeded in logging the location and movement of Plaintiffs and their cars daily—and on many days, on multiple occasions.

54.  The City intends to retain that information and the future information about Plaintiffs that it will continue to record daily, for three years from the date of the original recording.  It also intends to share that information with the Federal Bureau of Investigation and other law enforcement personnel throughout Florida.

55.  The City states that it intends to do more with its treasure-trove of ALPR data than simply await evidence that a traffic infraction or crime has been committed—and then search its data for evidence to assist with its response.

Rather, it states explicitly that it intends to use its data to "probatively reduce crime and traffic incidents before they occur."  Exhibit B.

56.  On information and belief, the City also authorizes its personnel to query the ALPR data it has collected without any particularized showing of suspicion.

57.  By collecting detailed information about Plaintiffs and their movements for an extended period of time, the City is conducting a "search" within the meaning of the Fourth Amendment.  That information provides an intimate window into Plaintiffs' life.  It permits the City to discern not only their movements but also to infer detailed information about where and when they work, whether they are in town or away on vacation, and with whom they associate.  For example, if several houses of worship are located on the far side of one of the bridges, the City can reasonably infer that an individual is attending one house of worship if an individual crosses the bridge at 8:45 a.m. every Saturday morning and crosses back at 10:45 a.m., and that the individual is attending a different house of worship if the crossing occur at those same times on a Sunday morning.

58.  The information collected by the City regarding Plaintiffs is already far more precise than the cell-site information at issue in *Carpenter*.  In that case, the

17

Supreme Court held that a police department's collection of cell-site information constituted a Fourth Amendment "search," even though the information covered seven days only and could provide only an approximation of the target's location. That is, it could only place the target within a "wedge-shaped sector ranging from one-eighth to four square miles." *Carpenter*, 138 S. Ct. at 2218.  In contrast, the City has been collecting location information about Plaintiffs for several months, and the information discloses their precise location—not a mere approximation. Because the Supreme Court held that the data collection in *Carpenter* constituted a Fourth Amendment search, *a fortiori* the City's more detailed collection of data regarding Plaintiffs' movements must also be deemed a Fourth Amendment search.

59.  Plaintiffs have not voluntarily waived their right to privacy simply by driving their cars on public roads that are visible to all in the vicinity of their travels.  Refraining from driving on the City's streets is not an option for Plaintiffs; daily travel in their cars is the only means by which Plaintiffs can commute to their places of employment and complete the other activities essential to their day-to-day existence.

60.  The fact that law enforcement personnel are free to engage in in-person observation of Plaintiffs as they drive into and out of the City does not make its

18

long-term use of ALPRs any less a "search" for Fourth Amendment purposes. The Supreme Court held in *Carpenter* that "individuals have a reasonable expectation of privacy in *the whole of* their physical movements." 138 S. Ct. at 2217. The City's continuous monitoring of Plaintiffs' movements, a monitoring that it would have been unable to undertake before the development of modern electronic equipment, impinges on their reasonable expectations of privacy in the whole of their physical movements.

61. Because the City's monitoring of Plaintiffs' movements over time constitutes a Fourth Amendment search, it may not engage in such monitoring without first obtaining a judicial warrant supported by probable cause.

62. The City has not obtained a judicial warrant authorizing it to record Plaintiffs' movements, nor does it possess probable cause for engaging in such a search. Accordingly, the City has injured Plaintiffs by violating their Fourth Amendment rights to be secure against unreasonable searches.

## CLAIM II

## Violation of Article I, Section 12

63. Plaintiffs Schemel, Overman, and Tschida repeat and incorporate by reference the allegations of Paragraphs 1 through 62 of the Complaint.

19

64.  Article I, section 12 of the Florida Constitution states that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated."  It provides that the protections it affords to individuals is coterminous with the protections provided by the Fourth Amendment of the U.S. Constitution.

65.  For the same reasons that the City's recording of Plaintiffs' movements constitutes a "search" for Fourth Amendment purposes, it also constitutes a "search" within the meaning of Article I, Section 12.

66.  Because the City's monitoring of Plaintiffs' movements for an extended period of time constitutes a search within the meaning of Article I, section 12, it may not engage in such monitoring without first obtaining a judicial warrant supported by probable cause.

67.  The City has not obtained a judicial warrant authorizing it to record Plaintiffs' movements for an extended period of time, nor does it possess probable cause for engaging in such a search.  Accordingly, the City has injured Plaintiffs by violating their rights under Article I, section 12 to be secure against unreasonable searches.

## CLAIM III

## Violation of Article I, Section 23

68.  Plaintiffs Schemel, Overman, and Tschida repeat and incorporate by reference the allegations of Paragraphs 1 through 67 of the Complaint.

69.  Article I, section 23 of the Florida Constitution states that "[e]very natural person has the right to be let alone and free from government intrusion into the person's private life except as otherwise provided herein."  Among the aspects of a person's "private life" that are protected from government intrusion is the whole of that person's physical movements.

70.  The Florida legislature has recognized that ALPR data implicates privacy concerns.  ALPR data are *exempt* from Florida's public records law, meaning that they are protected from disclosure by state actors.  *See* Fla. Stat. § 316.0777.

71.  The government intrudes upon that privacy interest by collecting and retaining information about an individual's movements for an extended period of time, regardless whether the government publicly discloses the retained information or makes any other specific use of the information.

72.  The City has no compelling interest in collecting and retaining information about Plaintiffs' movements for an extended period of time.

21

73.  The City contends that the collection and retention of its ALPR information—consisting of millions of license-plate images, categorized by date and location of each image—serves a law-enforcement purpose.  Even if that purpose could satisfy the "compelling state interest" requirement imposed by Article I, section 23, the City's ALPR system does not seek to satisfy that interest "through use of the least intrusive means."

74.  The City retains its records of Plaintiffs' movements for at least three years—and even longer if it claims that continued retention serves a valid investigatory purpose.  A far less intrusive means of satisfying whatever interest the City has in recording Plaintiffs' daily movements would be to limit retention of those records to no more than a very short period of time, after which the City would destroy all such records.

75.  Because the City cannot demonstrate: (1) that it has a compelling interest in retaining for three or more years its records of Plaintiffs' movements; and (2) that retention serves its valid interests through use of the least intrusive means, the City has injured Plaintiffs by violating their rights under Article I, section 23.

22

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Shannon Schemel, Stephen Overman, and Michael Tschida respectfully pray that this Court award the following relief:

A.  A declaration that Defendants are violating Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution and Article I, sections 12 and 23 of the Florida Constitution by using ALPRs to record detailed information about their daily movements by car and by retaining that information for three or more years;

B.  An injunction prohibiting Defendants from retaining for more than a brief period information it gathers through ALPRs regarding Plaintiffs' movements by car—in no event longer than the time necessary to investigate known incidents of legitimate interest to law enforcement authorities.

C.  An injunction requiring Defendants to delete all such information gathered by Defendants.

D.  An injunction requiring Defendants to direct other law enforcement agencies with whom it has shared such information to delete the information, and prohibiting Defendants from sharing information regarding Plaintiffs with other law enforcement agencies unless those agencies agree to abide by the terms of the Court's judgment as it applies to Defendants.

E.  Such other relief as the Court deems just and proper, including an award

of attorneys' fees and costs.

Dated: February 7, 2022                 Respectfully submitted,

                                        Richard A. Samp, Lead Counsel
                                          Virginia Bar No. 33856
                                          (special admission pending)
                                        Sheng Li
                                          Md. Bar No. 1508180001
                                          (special admission pending)
                                        NEW CIVIL LIBERTIES ALLIANCE
                                        1225 19th Street NW, Suite 450
                                        Washington, DC 20036
                                        202-869-5210
                                        rich.samp@ncla.legal

                                         Counsel for Plaintiffs